UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                                           :
ZODIAC MARITIME LIMITED and TOCIR                          :
SHIPPING LIMITED PARTNERSHIP,                              :
                                                           :
                              Plaintiffs,                  :
                                                           :   Civil Action No. 1:24-cv-351
              -against-                                    :
                                                           :
GLENCORE SINGAPORE PTE. LTD.,                              :
                                                           :
                              Defendant.                   :
                                                           :
                                                           :
-----------------------------------------------------------x

## COMPLAINT

Zodiac Maritime Limited ("Zodiac") and Tocir Shipping Limited Partnership (collectively, with Zodiac, "Plaintiffs") bring this action against Defendant Glencore Singapore Pte. Ltd. ("Glencore").  Plaintiffs, through their counsel, allege as follows:

### NATURE OF THE ACTION

1.     Glencore sold contaminated high-sulfur fuel oil ("HSFO") to Plaintiffs' vessel and more than one hundred other vessels in the Port of Singapore between January and April 2022.  In violation of applicable international regulations and quality standards, and express provisions of its contract with Zodiac, Glencore supplied fuel that contained excessive levels of chlorinated organic compounds ("COCs"), jeopardized the safety of the vessel as well as its crew, and adversely affected the ship's machinery, seriously risking a major marine casualty and environmental damage.

2.     Glencore supplied this defective fuel to Plaintiffs' vessel knowingly or recklessly. It supplied the same defective fuel to hundreds of other vessels.  As a direct result, Plaintiffs' vessel lost all navigational power while at sea, creating potentially life-threatening conditions for

the vessel's crew.  In all, Plaintiffs sustained millions of dollars in damage.  Other vessels Glencore supplied with defective fuel sustained similar damage.

3.    Glencore knew or consciously avoided knowledge that its fuel was defective when sold.  After Plaintiffs' vessel and hundreds of others became aware of the dire operational problems caused by the defective fuel and the resulting grave safety concerns, Glencore knowingly and recklessly failed to provide those vessels with crucial information that would have prevented the harm they have suffered, and indeed provided false information in an attempt to cover up its misconduct.  Even now, after the contamination of the fuel can no longer be disputed, Glencore continues to deny responsibility and refuses to compensate injured ship owners and operators for the substantial damages undeniably caused by Glencore's defective fuel.  Plaintiffs accordingly bring this action to hold Glencore accountable for the harm caused by its egregious conduct.

**PARTIES**

4.    Plaintiff Tocir Shipping Limited Partnership is a partnership registered in Liberia and the disponent owner of the *Wugang Haoyun*, a large bulk ore carrier, pursuant to a bareboat charter with non-party Tocir Shipping Inc., the registered owner of the *Wugang Haoyun*.  Tocir Shipping Limited Partnership possesses and controls the *Wugang Haoyun* and is responsible for its maintenance and repair.

5.    Plaintiff Zodiac Maritime Limited is a company registered in the United Kingdom.  It engages in international maritime shipping management and operation.  Tocir Shipping Limited Partnership appointed Zodiac to act as its agent and manager of the *Wugang Haoyun*.  As manager, Zodiac is responsible for arranging and supervising repairs and maintenance to the *Wugang Haoyun*, but any repair and maintenance costs Zodiac incurs are

reimbursed by Tocir Shipping Limited Partnership.

6.      Defendant Glencore Singapore Pte. Ltd. is a Singapore-registered entity engaged in the business of supplying marine fuel.  Glencore has a principal place of business at 1 Temasek Avenue, Singapore 039192.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1333 because Plaintiffs assert claims for breach of maritime contract and maritime torts arising out of Glencore's sale of contaminated marine fuel oil.

8.      Venue in the Southern District of New York is proper because Glencore's General Terms and Conditions for the Sale of Marine Fuels specify this Court as the exclusive forum for any disputes relating to the contract.

## GENERAL FACTUAL ALLEGATIONS

### A.      Regulations Prohibit Marine Fuel from Containing COCs

9.      HSFO is one of the primary types of marine fuel (or "bunkers") used by ocean-going commercial vessels such as Plaintiffs' vessel.  HSFO consists of the residual products from the oil refining process.  Bunker suppliers, such as Glencore, often blend HSFO with higher-grade oil products and other hydrocarbons to meet the specifications of end-user vessels. Internationally adopted standards and applicable international law govern the contents and quality of marine fuels.  Purchase agreements for HSFO routinely incorporate these requirements.

10.     International Standard ISO 8217:2017, titled "Petroleum products – Fuels (class F) – Specifications of marine fuels," sets out the most widely used marine fuel standard.  Clause 5.1 specifies that HSFO must "consist predominantly of hydrocarbons primarily derived from petroleum sources," but it may contain other hydrocarbons.  Because HSFO is composed of a

blend of various hydrocarbons, Tables 1 and 2 of ISO 8217:2017 dictate specific physical criteria – such as viscosity and density – that the fuel must meet.  Further, Clause 5.2 of ISO 8217:2017 states that "[t]he fuel shall be free from any material at a concentration that causes the fuel to be unacceptable for use in accordance with Clause 1 (i.e., material not at a concentration that is harmful to personnel, jeopardizes the safety of the ship, or adversely affects the performance of the machinery)."[1]

11.     The International Convention for the Prevention of Pollution from Ships ("MARPOL") imposes similar requirements.  MARPOL Annex VI Regulation 18 provides that "the fuel oil shall not include any added substance or chemical waste which . . . jeopardizes the safety of ships or adversely affects the performance of the machinery."

12.     HSFO that contains excessive levels of COCs does not meet the requirements of ISO 8217:2017 or MARPOL Annex VI.  The International Council on Combustion Engines ("CIMAC") explained in a report in October 2022 (the "CIMAC Report") that COCs can cause "filter clogging," "separator sludging," and damage to "the sliding surface of the fuel system components resulting in rapid corrosive damage."  This type of damage violates ISO 8217: "[F]uel oil suppliers have an obligation to comply with the ISO 8217 standard in its entirety which . . . includes Clause 5," and specifically Clause 5.2 (described above), "to ensure that no unacceptable material which might cause an adverse effect to the ship's machinery enters the fuel.  If proven that the fuel, as supplied, is responsible for experienced operational problems, it

---

[1] The prior version of this standard, ISO 8217:2010, included similar requirements. Clause 5.5 stated that "[t]he fuel shall not contain . . . any added substance or chemical waste that" (a) "jeopardizes the safety of the ship or adversely affects the performance of the machinery" or (b) "is harmful to personnel[.]"

would point to the bunkers not having met the ISO 8217 standard."  The same is true for

Regulation 18 of MARPOL Annex VI.

13.     Vessel operators rely on bunker suppliers' compliance with these requirements to

ensure that a vessel's fuel supply is safe to use.  The International Maritime Organization

("IMO") and industry groups have recognized that "[f]uel oil quality is a critical safety matter."

As one coalition of industry groups explained, the "consequences of a ship losing power as a

result of blocked fuel oil filters, fuel oil pump failure and failure of fuel oil separators or damage

to the engine" can include "allision, collision or grounding."  Another industry group explained

that the industry has only avoided "a serious accident" by "pure luck."

14.     Contaminated fuels create "[p]articularly serious safety risks to ships and crews."

Indeed, the United States Coast Guard recently issued a Marine Safety Alert warning that the

"failure to ensure a supply of fuel free of water and contaminants can have devastating

consequences.  The "standard fuel oil testing methods found in the ISO 8217 specification" may

not detect all contaminants, as evidenced by prior contamination incidents "in the United States

Gulf Coast region, Caribbean ports, Singapore, [and] Malaysia" where "many ships

experienc[ed] engine damage."  Nevertheless, such contamination still violates Clause 5 of ISO

8217 and MARPOL Annex VI Regulation 18.

15.     For this reason, ISO 8217:2017 Annex B also requires fuel suppliers – like

Glencore – to have "adequate quality assurances and management of change procedures to

ensure that the resultant fuel is compliant with the requirements of Clause 5."  Annex B thus

places the burden on fuel suppliers to monitor and detect whether their fuel contains any harmful

chemicals, such as COCs.  Indeed, while "[f]uel oil purchasers are responsible for correctly

specifying the fuel oil which is to be supplied," the IMO has made clear that "[i]t is the

responsibility of the supplier to deliver fuel oil which is compliant with the agreed specification and statutory limits," including "that [the] fuel oil delivered" does not "jeopardize the safety of ships or adversely affect the performance of machinery."

16.     Compliance with ISO 8217 and MARPOL Annex VI is enforced through several methods.  Regulation 18(7)(d) of MARPOL Annex VI obligates convention members – including Singapore – to "take action as appropriate *against fuel oil suppliers* that have been found to deliver fuel oil that does not comply with that stated on the bunker delivery note." (Emphasis added.)  And MARPOL Annex VI Regulation 18 requires a fuel supplier to certify on the bunker delivery note that "the fuel oil supplied is in conformity with . . . regulation 18(1)." *See also* 40 C.F.R. § 1043.80.  Moreover, individual countries and ports often have additional enforcement mechanisms.  Under U.S. law, it is illegal for any person to violate any provision of MARPOL.  *See* 33 U.S.C. § 1907; 40 C.F.R. § 1043.30(a).  Similarly, the Maritime and Port Authority of Singapore ("MPA") requires companies to possess a valid license for bunkering activities.  To hold such a license, a bunker supplier must comply with the Singapore Standard for Quality Management for Bunker Supply Chain.  That standard is intended to ensure that "the quality of bunkers supplied to vessels conforms to ISO 8217."  The standard obligates bunker suppliers to ensure that the bunkers do not include any added substance, chemical waste, or other non-hydrocarbon material that renders the bunker unfit for use.

17.     Glencore, as a bunker supplier in the Port of Singapore, is subject to both the MPA licensing requirements and MARPOL Annex VI.  In turn, vessel operators – like Plaintiffs – rely on bunker suppliers' compliance with MARPOL Annex VI to ensure the fuel they use complies with the convention.

**B.      Glencore Supplies Fuel to the Port of Singapore**

18.      Beginning in January 2022, Glencore purchased a quantity of HSFO to be blended and prepared for sale in Singapore.  This fuel was shipped from the Port of Khor Fakkan in the United Arab Emirates by a tanker to Glencore's floating storage facilities in Tanjong Pelepas, Malaysia, where it was further blended.  From there, Glencore transported the HSFO to its storage facilities in Singapore.  Glencore then sold this fuel to various vessels in the Port of Singapore.  Glencore also sold a portion of this fuel to PetroChina International ("PetroChina") to be supplied to vessels.  Glencore and PetroChina ultimately supplied this HSFO to approximately 200 vessels in the Port of Singapore between January and April 2022.

19.      At each step in this process, Glencore was best positioned to ensure its fuel complied with ISO 8217:2017 and MARPOL Annex VI Regulation 18.  Until the HSFO was delivered to individual vessels (or sold to PetroChina), Glencore had exclusive control over the fuel and the means and opportunity to verify that the fuel was acceptable.  Annex B of ISO 8217:2017 required Glencore to have "adequate quality assurance" procedures in place during this process.

**C.      Glencore's Contaminated Fuel Causes Widespread Damage to Ships**

20.      After using the Glencore-supplied HSFO, numerous ships encountered severe engine issues.  These ships reported sticking fuel pumps, engine performance failures, separator sludging, and filter blocking, which resulted in critical operating problems for both main and auxiliary engines.

21.      The CIMAC Report clearly documented the issues these vessels encountered. That report noted that over 100 ships reported operational problems after using the Glencore-supplied HSFO.  In particular, the report explained that the contaminated fuel caused "rapid

degradation of the fuel pumps and injectors."  In one instance, the fuel caused newly replaced pumps and injectors to fail "[w]ithin a week."

22.     Glencore knew of these problems almost immediately after they began occurring. On information and belief, numerous vessels, including Plaintiffs' vessel, began reporting engine issues to Glencore within days of the problems arising.[2]  On information and belief, these vessels also sought information from Glencore as they worked to address the engine problems while at sea.

23.     By early March, industry groups began issuing alerts about Glencore's fuel.  On March 1, 2022, Viswa Lab ("Viswa") – a third-party bunker testing provider – alerted the industry it had analyzed the bunkers of three ships and found COC contamination.  The alert explained that "[o]ver the last few weeks Viswa has identified 3 bunkers supplied in Singapore that had high levels of organic chlorides."  Viswa also explained that "[o]ne of the vessels has already reported damage to Maine Engine and Auxiliary Engine fuel pump (Wear and Seizure), damage to filter candles and has reported higher levels of sludge generation."  Viswa cautioned that "Organic Chlorides in bunker fuels have been known to cause serious problems to machinery," including "fuel pumps and cylinders."

24.     The Viswa alert further disclosed that "[t]he 3 supplies were made by 2 different suppliers" – later determined to be Glencore and PetroChina.  On information and belief, the

---

[2] Plaintiffs' information and belief is based on its analysis of:  (i) reports and press releases issued by the MPA relating to its investigation of the fuel contamination; (ii) industry alerts regarding the fuel contamination; (iii) publicly available news and media articles and investigations; and (iv) other sources.  Plaintiffs currently lack access to all the facts relating to Defendant's improper conduct because much of that information lies exclusively within the possession, custody, or control of Defendant.  Plaintiffs expect further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

affected vessels informed Glencore that testing done by Viswa had confirmed the presence of COCs in the HSFO that Glencore supplied.

25.     On March 11, 2022, Veritas Petroleum Services ("VPS") – another bunker testing company – issued a "bunker alert" stating that it had also detected chlorinated hydrocarbons in fuel samples from HSFO deliveries in Singapore.  The notice explained that the "fuel deliveries were made by a couple of suppliers" and the contaminated fuel could cause "worn out fuel pumps, fuel valve problems and subsequently main- and/or auxiliary engines failing to start." On information and belief, the affected vessels informed Glencore that testing done by VPS had confirmed the presence of organic chlorides in the HSFO that Glencore supplied.

26.     Throughout this time and until April 1, 2022, Glencore continued to supply HSFO that it knew was contaminated with high levels of COCs.

### D.     The Maritime and Port Authority of Singapore Begins Investigating the Contaminated Fuel

27.     The Maritime and Port Authority of Singapore regulates marine and port service facilities in the Port of Singapore, including the issuance of licenses to bunker supply companies like Glencore.

28.     On March 14, 2022, MPA was notified that a number of ships in the Port of Singapore had been supplied with HSFO that was contaminated with high levels of COCs.  MPA immediately contacted the relevant bunker suppliers – including Glencore – and directed them to "take necessary steps to stop supplying the affected fuel and to also inform all the ships that were supplied with the fuel to exercise caution when using it."  As explained in further detail below, Plaintiffs received no such cautionary communication from Glencore, despite regular contact with Glencore regarding the major issues on board the *Wugang Haoyun*.

29.     On April 13, 2022, MPA released its preliminary findings on the contaminated bunker fuel.  It explained that its preliminary investigation revealed that Glencore supplied the contaminated fuel:  "Glencore informed MPA that on receiving reports of its fuel being contaminated, Glencore proceeded to test the fuels supplied by its sources used in its blended product, and discovered that one of them that was sourced from overseas had contained about 15000 [parts per million ('ppm')] of COC."  MPA explained that Glencore had been the sole source of the contaminated fuel; PetroChina's contaminated supply came from Glencore.  At that time, MPA noted that approximately "80 ships have reported various issues with their fuel pumps and engines."  The CIMAC Report would later reveal that "more than 100 ships reported operational problems using high sulphur residual fuels bunkered in Singapore."

30.     MPA issued another update on May 5, 2022.  It explained that the "HSFO containing high concentrations of COC was traced back to fuel purchased by [Glencore] in January and February 2022" and had originated from the Port of Khor Fakkan in the United Arab Emirates.  MPA's testing revealed that samples taken from the original tanker, Glencore's fuel blending facilities, and storage facilities all matched the samples taken from the affected ships.

31.     On August 3, 2022, MPA completed its investigation.  It explained that between March 21 and March 23, 2022, "the fuel oil testing laboratory engaged by Glencore reported results showing that the samples taken from the parcels of fuel oil Glencore purchased, contained concentrations of COCs that ranged from approximately 2,000 ppm to 15,000 ppm."  But despite this knowledge, "Glencore continued to supply bunkers blended with the fuel purchased that was contaminated with high levels of COC to vessels in the Port of Singapore from 22 March 2022 to 1 April 2022" and thus "contravened the terms and conditions of its Bunkering License (Bunker Supplier) in failing to ensure that no bunkers supplied by it were contaminated."

32.     As a result of Glencore's reckless and willful conduct, MPA suspended

Glencore's bunkering license for two months and demanded that Glencore "improve its internal

procedures to ensure that prompt action is taken in future when it becomes aware of, or

reasonably suspects, any irregularity in fuel quality."

**PLAINTIFFS' SPECIFIC FACTUAL ALLEGATIONS**

**A.     Zodiac Agrees To Purchase Fuel from Glencore**

33.     On January 31, 2022, Zodiac agreed to purchase 5,950 metric tons of HSFO for

approximately $3 million to be delivered to the *Wugang Haoyun* in mid-February 2022.

Zodiac's affiliated bunker agent, Albany Bunkers, brokered the agreement, but the contract was

expressly between Glencore and Zodiac.  Pursuant to the agreement, the fuel supply was required

to comply with ISO 8217:2010 and MARPOL Annex VI Regulation 18.  The contract also

specifically stated that "the fuel oil shall be free from inorganic acid" and "the fuel oil shall not

include any added substance or chemical waste which either; jeopardize the safety of ships or

adversely affects the performance of the machinery."  The contract reserved Zodiac's right "to

claim demurrage" "in the event of any delays or disputes," and explicitly stated that its

provisions "supersede supplier/sellers terms and conditions."

34.     Glencore supplied the bunkers to the *Wugang Haoyun* in Singapore on February

16 and 17, 2022, and certified that the bunkers complied with Regulation 18 of MARPOL Annex

VI.  On information and belief, Glencore knew or should have known that the fuel supply was

contaminated at the time it was delivered to the *Wugang Haoyun*.  Specifically, Viswa's March 1

alert explained that it had detected COCs over the preceding "few weeks" – prior to the date

Glencore supplied the *Wugang Haoyun*.  On information and belief, the affected vessels

informed Glencore of these test results, yet Glencore did not inform Plaintiffs or conduct further

testing.

11

35.     The *Wugang Haoyun* departed Singapore on February 17, bound for West Africa.

**B.     Glencore's Fuel Caused Significant Damage to the *Wugang Haoyun***

36.     On February 21, 2022, just four days after leaving Singapore, the *Wugang Haoyun* began experiencing mechanical problems with the main engine and two auxiliary engines.  While conducting repairs, the crew discovered issues with the main and auxiliary engines' fuel equipment.  These issues persisted through the next several days.  At one point, the crew could not start the main engine and ultimately switched the auxiliary engine over to a different fuel source – marine gas oil – for safety reasons.

37.     Zodiac provided oral notice to Glencore on March 7, 2022, that the *Wugang Haoyun* had encountered persistent mechanical issues while trying to use the Glencore-supplied fuel.  Zodiac requested information, but Glencore made no substantive response.

38.     By this time, Glencore knew its fuel was contaminated.  On information and belief, Glencore had been previously notified by its customers that Viswa had confirmed the presence of excessive levels of COCs in Glencore's bunker supply.  Yet Glencore repeatedly failed to communicate that fact to Zodiac.  Nor did Glencore communicate to Zodiac that VPS's testing had also found excessive levels of COCs in Glencore's supply.

39.     By March 11, 2022, the *Wugang Haoyun* encountered additional engine issues and was adrift off the coast of Reunion Island.  Because of the loss of power and proximity to shore, the *Wugang Haoyun* required tug assistance to navigate away from the island.  Zodiac also dispatched technicians and spare parts to the vessel to complete necessary repairs.

40.     On March 14, 2022, Zodiac provided Glencore with a written notice of claim under their purchase contract.  The notice explained that the vessel was "having significant difficulty in consuming this fuel and the situation ha[d] not improved in the last few days."  Zodiac specifically inquired if any other vessels had suffered similar difficulties using the HSFO.

Although Glencore knew that other vessels had been affected by its HSFO, Glencore did not respond to Zodiac's specific request for information.  What is more, Glencore also disregarded MPA's instruction to "inform all the ships that were supplied with the [contaminated] fuel to exercise caution when using it."  Glencore has never disclosed to Zodiac that it had been contacted by MPA regarding its contaminated fuel supply.

41.     On March 15, 2022, the *Wugang Haoyun* underwent repairs at Port Louis, Mauritius, to fix the engine damage caused by the contaminated fuel.  The *Wugang Haoyun* had suffered significant damage to the fuel systems of both the main and auxiliary engines, including seized fuel pumps, broken fuel injectors, and clogged and damaged fuel filters.  Efforts to repair the vessel with replacement parts while unaware of the contaminated HSFO only exacerbated the extent of the damage.  Replacement parts were installed but then failed within days of installation.  Additional damage to these replacement parts would not have occurred if Glencore had been forthcoming about the HSFO problem that it instead concealed.

42.     The damage to the *Wugang Haoyun* was consistent with the damage to other vessels reported by the CIMAC in October 2022.

43.     While the *Wugang Haoyun* underwent repairs at Port Louis, Glencore continued to withhold vital information that there were contaminants in the fuel.  Accordingly, Plaintiffs remained unsure of the cause of the different engine issues their vessel had encountered. Mindful that a possible cause of the problems was the fuel, notwithstanding receiving continued misleading information from Glencore, Zodiac considered it necessary to take on additional, alternative bunkers and the vessel took a supply of both very low-sulfur fuel oil and low-sulfur marine gas oil.  Plaintiffs paid approximately $1 million for these bunkers.

44.     The *Wugang Haoyun* continued to encounter engine issues after leaving Port Louis.  The crew reported that the filter plungers had clogged 24 hours after resuming use of Glencore's fuel.  By March 23, the crew could not start the main engine due to damage caused by Glencore's fuel.  By this point, the crew's attempt to switch over to the new fuel bunkered at Port Louis was futile – the main engine would no longer run on clean fuel either.  The *Wugang Haoyun* eventually requested tug assistance to reach Cape Town, South Africa.

**C.     Glencore Misrepresented its Knowledge and Refused To Accept Responsibility**

45.     On March 23, 2022, Glencore finally responded to Zodiac's notice of claim and equivocated.  It did not disclose its own awareness of the HSFO contamination but said only that its "internal investigation [was] currently ongoing."  Glencore also requested additional documents and information from Zodiac, which Zodiac provided within a day.

46.     But as the MPA's final August 3, 2022 report makes clear, Glencore's own testing between March 21 and March 23 revealed excessive levels of COCs in its fuel.  By March 23, when Glencore represented to Zodiac that its "investigation [was] currently ongoing," it knew that the fuel it had sold to Zodiac contained excessive levels of COCs.  Glencore did not communicate these results to Zodiac then and has never communicated these results to Zodiac.

47.     On March 31, 2022, Zodiac received the results of its independent fuel testing performed by Lloyd's Register.  The testing – performed on a bunker drip sample taken from the Glencore HSFO – revealed elevated levels of "various chlorinated compounds":  "1,2-dichloroethane was present at a concentration of 5,167mg/kg and 1,1,2-trichloroethane was present at a concentration of 910mg/kg."  Additional "chlorinated compounds were present at an approximate total concentration of 1,200 mg/kg."  The report concluded that "there is evidence for very high levels of various chlorinated compounds.  These components should not be found

14

in marine fuels and their presence contravenes the stipulations of Revised MARPOL Annex VI regulation 18.3 and International Marine Fuel Standard ISO 8217, Clause 5."

48.     On April 4, 2022, the *Wugang Haoyun* arrived in Cape Town under tow.  Zodiac requested permission from Glencore to de-bunker all of the contaminated fuel.  Glencore denied Zodiac's request.  Zodiac complied with Glencore's request to only de-bunker the minimum amount of bunkers necessary and return the remainder to Glencore in Singapore.  Calculating the prudent amount of fresh bunkers needed for the ship to safely return to Asia (to perform the ship's next commercial trading activity), Zodiac arranged to de-bunker approximately 1,650 metric tons of the contaminated fuel in Cape Town.  With sufficient quantities of HSFO unavailable in Cape Town, and in an effort to mitigate their losses, Plaintiffs paid $865,514.87 to take on only 550 metric tons of very low-sulfur fuel oil and 214 metric tons of low-sulfur marine gas oil in Cape Town.  They planned for further bunkering of the vessel in West Africa, where cheaper HSFO was available.

49.     The *Wugang Haoyun* departed Cape Town on April 17, 2022, and completed the remainder of the voyage, taking on additional bunkers in Luanda, Angola, on May 18, 2022, at a cost of $1.6 million and again in Singapore on June 19, 2022 at a cost of $333,714.27.

50.     Throughout this period, Zodiac attempted unsuccessfully to obtain appropriate relief from Glencore.  Its request was straightforward and reasonable:  Zodiac would return the remaining 4,200 metric tons of contaminated HSFO to Glencore, and Glencore would provide the 5,950 metric tons of clean HSFO specified in the original contract.  While this would mean Plaintiffs would bear significant losses, such a compromise could be achieved quickly, without complexity, and would enable the parties to resume their normal commercial relationship.

51.     Glencore, however, refused Zodiac's proposed resolution.  Accordingly, on July 18 and 19, 2022, Glencore de-bunkered the remaining 4,203 metric tons of contaminated HSFO and re-bunkered 4,200 metric tons of new HSFO.  Zodiac explicitly stated it was accepting the re-bunkering without prejudice to its legal rights.  Zodiac also made clear it was not waiving any legal rights by paying the full contract price for the entire contract volume of 5,950 metric tons.

**FIRST CAUSE OF ACTION:**
**BREACH OF CONTRACT**

52.     Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

53.     Plaintiffs had a valid and enforceable contract with Glencore.  Under the contract, Glencore was required to supply HSFO to the *Wugang Haoyun* that met the parties' contractual specifications, including compliance with ISO 8217 and MARPOL Annex VI.

54.     Plaintiffs' independent testing confirmed that Glencore's HSFO contained excessive levels of COCs in violation of ISO 8217 and MARPOL Annex VI.  Other independent bunker testing providers, including Viswa and VPS, also detected excessive levels of COCs in Glencore's fuel.

55.     Likewise, Glencore's own testing revealed that its fuel was contaminated with COCs.  Yet, despite the results of its own testing and the reported results of third-party testing, Glencore continued to sell contaminated fuel to other vessels.

56.     Glencore breached the contract by supplying fuel that contained excessive amounts of COCs in violation of ISO 8217, MARPOL Annex VI, and the contract's express requirement that the "fuel oil shall not include any added substance" which "jeopardize[s] the safety of ships or adversely affects the performance of the machinery."

57.    Glencore's contaminated fuel caused significant mechanical damage to the *Wugang Haoyun*'s engines and fuel systems, which jeopardized the safety of the vessel and its crew.

58.    Plaintiffs incurred significant costs attempting to repair this damage, which were exacerbated by Glencore's repeated omissions and misrepresentations regarding Glencore's knowledge of the fuel contamination.  Plaintiffs also incurred significant costs mitigating a potential marine casualty after the damage caused by Glencore's fuel left the vessel without power near shore.  If Plaintiffs had not incurred these costs and taken such mitigating actions, they would have jeopardized the safety of the crew and the vessel and risked a serious environmental disaster.  In addition, Plaintiffs were required to procure new fuel supplies at substantial cost as a direct result of the defective nature of Glencore's fuel.

59.    Plaintiffs accordingly seek damages for Glencore's breach.

**SECOND CAUSE OF ACTION:**
**NEGLIGENCE and GROSS NEGLIGENCE**

60.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

61.    As a supplier of HSFO, Glencore had duties of care towards Plaintiffs to: (i) exercise the degree of care in its plan or design of products to avoid any unreasonable risk of harm to the vessels exposed to danger when the HSFO was used in the manner for which it was intended; and (ii) conduct reasonable investigations to identify defects in its products.  These duties arise from Glencore's position as a licensed and regulated fuel supplier and are independent of Glencore's contract with Zodiac.

62.    As a bunker supplier, Glencore performed a service affecting a significant public interest and its failure to perform that service carefully and competently could have had

17

catastrophic consequences.  Vessels depend on bunker fuel to provide navigational power while at sea and ensure safe transit through rough water.  The loss of power – caused by defective fuel – can result in marine casualties and environmental disasters.  Indeed, Glencore's defective fuel left the *Wugang Haoyun* powerless at sea, in close proximity to land, and in need of tug assistance to avoid a wreck.

63.     Glencore controlled the design, blending, and manufacturing of the HSFO, and, as the supplier, Glencore knew or should have known that the HSFO contained excessive amounts of COCs, rendering it unsafe and defective.

64.     Glencore breached its duties of care by:  (i) failing to use and exercise reasonable care, skill, and diligence to supply HSFO, which resulted in the fuel being unsafe, defective, and dangerous; (ii) failing to investigate whether the HSFO contained concentrations of chemicals which would render the fuel oil unsafe, defective, or dangerous to use aboard the vessels; and (iii) disregarding warnings that would indicate to any reasonable supplier that further investigation was necessary to determine whether the HSFO was unsafe and defective.

65.     Glencore was best positioned to prevent the harm its contaminated fuel caused. Glencore knew the origin of the HSFO and controlled its transport from the United Arab Emirates to Glencore's blending facility in Malaysia and from Malaysia to Glencore's storage facilities in Singapore.  Glencore had the means and opportunity to test the HSFO and was obligated by Annex B of ISO 8217:2017 to utilize "adequate quality assurances" to ensure the HSFO complied with ISO 8217.

66.     Glencore knew that standard testing methods were inadequate to detect all contaminants that violate ISO 8217 and MARPOL Annex VI.  After a similar instance of widespread contamination that originated in the Port of Houston, Texas, in 2018, multiple vessel

owners and operators sued a Glencore affiliate for damages arising from the contaminated bunkers.  *See, e.g.*, *KPI Bridge Oil, Inc. v. Glencore Ltd.*, l:19-CV-02772-ER (S.D.N.Y. Mar. 28, 2019); *Centurion Bulk Pte Ltd. v. NuStar Energy Servs., Inc.*, 4:19-CV-00931 (S.D. Tex. Mar. 14, 2019); *ADMIntermare v. Kamca Trading SA*, 1:20-CV-01223-JPO (S.D.N.Y. Feb. 12, 2020); *VL8 Pool, Inc. v. Glencore Ltd.*, 1:20-CV-02053-ALC (S.D.N.Y. Mar. 6, 2020).  Like Glencore's contaminated fuel in Singapore, standard testing failed to detect the presence of harmful chemicals during the 2018 incident.  Yet, the fuel caused significant damage to vessels' engines in violation of ISO 8217 and MARPOL Annex VI Regulation 18.

67.     Indeed, in a suit Glencore Limited brought involving contaminated fuel, Glencore explained that the presence of harmful "chemicals and contaminants is a latent defect that can only be detected by gas chromatography-mass spectrometry ('GC-MS') or Fourier transform infrared spectroscopy ('FTIR') tests."  *Glencore Ltd. v. Freepoint Commodities LLC*, No. 653431/2019, Dk. No. 71, at 4 (N.Y. Sup. Ct. N.Y. Cty. June 25, 2021).  Despite knowing that such tests are necessary to detect harmful contaminants, Glencore did not perform a GC-MS or FTIR test prior to supplying fuel to the *Wugang Haoyun*.

68.     As Glencore explained in the *Freepoint* case, "[t]he presence of latent contaminants can also be indicated if the fuel product damages engines or equipment when used or stored in the ordinary course."  *Id*. at 4-5.  On information and belief, prior to Glencore supplying HSFO to the *Wugang Haoyun*, Glencore's customers informed it that third-party testing had detected COCs in Glencore's fuel supply and that the fuel had caused physical damage to one vessel's engine equipment – an additional indication that the fuel contained prohibited chemicals.  In Glencore's own words, "a manufacturer, blender and supplier of fuel products" would know that the presence of harmful chemicals "was a 'red flag' that the fuel

product was potentially dangerous." *Glencore Ltd. v. Freepoint Commodities LLC*, No. 653431/2019, Dk. No. 54, at 8 (N.Y. Sup. Ct. N.Y. Cty. Mar. 10, 2021). In those circumstances, it is "accepted industry practice" for the seller to "investigate to determine the cause of the [contamination] . . . and identify potential defects in the fuel product, including defects that could render the fuel product dangerous when stored or used as intended." *Id*. Glencore did not follow "accepted industry practice" here. Even after receiving reports of contamination, Glencore did not perform additional testing or investigate whether its fuel supply was contaminated before supplying fuel to the *Wugang Haoyun* and many others.

69. Glencore knowingly and recklessly sold defective fuel to more than 100 vessels in the Port of Singapore.

70. Further, Glencore disregarded MPA's directive on March 14, 2022, to inform its customers, including Plaintiffs, of the fuel contamination. Multiple industry groups had also issued warnings about fuel contamination, and Glencore's customers – including Plaintiffs – had complained of issues relating to the consumption of Glencore's fuel. Yet Glencore knowingly withheld critical information from customers who had already purchased the contaminated fuel and continued to supply the fuel knowing it was wholly unfit for use because it contained excessive amounts of COCs and did not comply with ISO 8217 and MARPOL Annex VI Regulation 18.

71. Glencore's egregious and willful disregard for its contractual obligations, regulatory requirements, and the well-being of its customers led MPA to suspend Glencore's license for two months.

72. Plaintiffs accordingly seek damages as a result of Glencore's grossly negligent acts.

### THIRD CAUSE OF ACTION:
### STRICT PRODUCTS LIABILITY

73.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

74.    Glencore is in the business of blending, manufacturing, and supplying finished fuel products for sale.

75.    As a manufacturer and supplier of fuel oil products, Glencore had a duty to warn of latent dangers that it knew or should have known would result from foreseeable uses of its product.

76.    Glencore knew or should have known that the HSFO it produced and supplied contained excessive amounts of COCs likely to damage the *Wugang Haoyun*'s engines.  The negative effect of COCs on engines and fuel equipment has long been documented and Glencore, as experts in the field, knew or should have known this.  The mechanical damage that the *Wugang Haoyun* suffered is consistent with prior incidents of COC contamination.

77.    Glencore was best positioned to detect COC contamination in its HSFO, yet Glencore failed to warn Plaintiffs of the HSFO's latent dangers.  Instead, Glencore supplied HSFO that purported to comply with ISO 8217 and MARPOL Annex VI, meaning that the HSFO supposedly did not contain any substances that would negatively affect the vessel's machinery or jeopardize the safety of its crew.  Unbeknownst to Plaintiffs, however, Glencore's HFSO was contaminated with excessive levels of COCs.

78.    Moreover, Glencore failed to warn Plaintiffs that its HSFO was contaminated even after Glencore's customers reported the contamination, Glencore's own testing confirmed the contamination, and MPA directed Glencore to warn Plaintiffs.

79.     As a direct, proximate, and foreseeable result of Glencore's failure to warn, the HSFO Glencore supplied damaged the *Wugang Haoyun*'s machinery and caused Plaintiffs to suffer harm.  This damage jeopardized the safety of the vessel and its crew and nearly resulted in a major marine casualty.

80.     Further, as a manufacturer and supplier of bunker fuel, Glencore had a duty to exercise the degree of care in its plan or design of products required to avoid any unreasonable risk of harm to anyone likely to be exposed to the danger when the product is used in the manner for which it was intended.

81.     Glencore breached this duty by producing HSFO which contained excessive levels of COCs that rendered it unsuitable for use and likely to cause damage to the users of the HSFO.  Glencore knew or should have known that the HSFO was contaminated with COCs, and Glencore failed to reasonably investigate whether the HSFO was defective.  Glencore could and should have produced the HSFO without excessive levels of COCs.

82.     Glencore had the means, opportunity, and obligation to ensure that its HSFO was suitable for use in marine vessels.  Glencore controlled the HSFO until it was delivered to Plaintiffs and other vessels and Glencore continued to supply the HSFO even after it knew it was defective and unsafe.

83.     Plaintiffs accordingly seek damages as a result of Glencore's failure to warn and Glencore's production of defective and unsafe HSFO.

**FOURTH CAUSE OF ACTION:
INTENTIONAL MISREPRESENTATION**

84.     Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

85.     At the time Glencore supplied the contaminated fuel to Plaintiffs, Glencore certified that the fuel complied with Regulation 18 of MARPOL Annex VI.  But Glencore knew or deliberately avoided knowledge that its fuel contained harmful levels of COCs in violation of Regulation 18 – rendering its certification false.  Plaintiffs relied on this false representation to their detriment.

86.     Further, on March 14, 2022, MPA contacted Glencore and informed it that MPA had received reports that Glencore's HSFO was contaminated.  MPA further directed Glencore to "inform all the ships that were supplied with the [contaminated] fuel to exercise caution when using it."

87.     By this time, other vessels had already informed Glencore that third-party testing had detected COC contamination in Glencore's HSFO and the HSFO was causing damage to the vessels' engines and fuel systems.

88.     Plaintiffs specifically informed Glencore on March 14, 2022, that the *Wugang Haoyun* was "having significant difficulty" consuming the fuel Glencore supplied and asked if any other vessels were having similar issues.

89.     Glencore did not inform Plaintiffs that the fuel was contaminated, as it was directed to by MPA, and Glencore did not inform Plaintiffs of the issues that other vessels had already reported.

90.     Instead, on March 23, 2022, Glencore told Plaintiffs that its "internal investigation is currently ongoing" and did not mention any fuel contamination issues.

91.     Glencore intentionally misrepresented the status of its investigation and its knowledge of the fuel contamination issue.

92.     MPA's August 3, 2022 report makes clear that Glencore knew by March 23 that its HSFO contained excessive amounts of COCs which was confirmed by Glencore's own testing.  Glencore also knew – from the March 14 MPA notice, prior industry alerts, and customer reports – that its contaminated fuel was causing severe engine damage to ships that used the fuel.

93.     By stating only that its "investigation [was] currently ongoing" in response to Plaintiffs' specific question and request for information, Glencore materially misled Plaintiffs because Plaintiffs reasonably inferred, under the circumstances, that Glencore was not aware of any other vessels that had mechanical issues while using Glencore's fuel.

94.     Plaintiffs relied on this intentional misrepresentation to their detriment and continued to replace damaged engine components and use the contaminated fuel.  If Glencore had been forthright, Plaintiffs could have switched to alternate fuel, thereby preventing the loss of power, which gave rise to the need for tug assistance and towage and the risk of a serious marine casualty, and limiting damage to the *Wugang Haoyun*'s engines.

95.     Plaintiffs thus suffered damages as a result of Glencore's intentional misrepresentation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment awarding:

A.     Compensatory, consequential, exemplary, and punitive damages in an amount to be determined;

B.     Attorneys' fees and costs to Plaintiffs; and

C.     Any other relief that the Court may deem just and appropriate.

Dated:          January 17, 2024

/s/ Mark C. Hansen

Mark C. Hansen (*pro hac vice* pending)
Travis G. Edwards (*pro hac vice* pending)
Dustin G. Graber (*pro hac vice* pending)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mhansen@kellogghansen.com
tedwards@kellogghansen.com
dgraber@kellogghansen.com

*Attorneys for Plaintiffs Zodiac Maritime Limited and Tocir Shipping Limited Partnership*

25